WILLIAM FAULKNER (83385)
SHARON KIRSCH (157157)
GEOFFREY BENTZEL (250073)
McMANIS FAULKNER & MORGAN
A Professional Corporation
50 West San Fernando Street, 10th Floor
San Jose, California 95113
Telephone:   408-279-8700
Facsimile:   408-279-3244
Email:       wfaulkner@mfmlaw.com
             skirsch@mfmlaw.com
             gbentzel@mfmlaw.com

Attorneys for Defendant,
CIPC WORLDWIDE HOLDINGS
CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NETSUITE, INC., a California corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>CIPC WORLDWIDE HOLDINGS CORPORATION, a corporation, and DOES One through Ten inclusive.<br><br>    Defendants. | No. 3:07-cv-05235-JL<br><br>**COUNTERCLAIM OF DEFENDANT CIPC WORLDWIDE HOLDINGS CORPORATION** |

Defendant and counterclaimant, CIPC Worldwide Holdings Corporation ("CIPC"), counterclaims against Plaintiff and counterdefendant, NetSuite, Inc. ("NetSuite") and alleges as follows:

**INTRODUCTION**

CIPC brings these claims for fraud, rescission, promise made without intent to perform, negligent misrepresentation, mistake, breach of contract and breach of the covenant of good faith and fair dealing. By this action, CIPC seeks all legal and equitable relief to which it may be entitled, including without limitation injunctive and declaratory relief, rescission, compensatory damages, attorney's fees and costs, and prejudgment interest.

## JURISDICTION AND VENUE

1. This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. section 1332 and diversity jurisdiction under the provisions of 28 U.S.C. section 1441(b) and 1446(a), in that it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs. Venue is proper under 28 U.S.C. Sections 1391 and 1400.

## THE PARTIES

2. CIPC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.

3. According to page 2, paragraph 3 of NetSuite's Complaint against CIPC, NetSuite is a corporation organized and existing under the laws of the State of California with its principal place of business in San Mateo County, California.

## FACTS

4. CIPC is one of the largest Voice-over-Internet Protocol (VoIP) providers for businesses in North America, doing business in the United States, Canada, Mexico and the United Kingdom. CIPC employs 512 people and generates approximately $200 million dollars in yearly revenue.

5. CIPC is informed and believes and thereon alleges that NetSuite provides Customer Relationship Management ("CRM") and Enterprise Resource Planning ("ERP") software to businesses. In addition, NetSuite holds itself out as a provider of professional services to customers to assist them with the implementation and/or integration of its Online Application with each Customer's systems ("Professional Services").

6. On August 26, 2006, CIPC began discussions with NetSuite about implementation of NetSuite's Online Application and Professional Services. CIPC gathered some information about NetSuite's product and reviewed it for several months. NetSuite offered CIPC an accounting and customer management platform that would allegedly allow it to merge CIPC's separate systems for customer service/management operations and billing. NetSuite promotes its platform with the phrase "One System, No Limits."

7.   On March 12, 2007, NetSuite assigned an account executive, Errol Getner, to the CIPC account. Mr. Getner discussed with CIPC the usage of NetSuite's product to automate CIPC's computer distribution division. After the discussions with Mr. Getner, CIPC entered into an agreement with NetSuite which provided CIPC with a license to use the NetSuite platform and for NetSuite to provide Professional Services to CIPC for maintenance of the platform. This agreement was titled "NetSuite License Agreement" ("Agreement") was executed by CIPC on March 31, 2007 and by NetSuite on April 25, 2007. (Attached hereto as Exhibit A is a true and correct copy of the Agreement).

8.   Estimate No. 58630 was prepared with the Agreement, incorporated by reference into the Agreement, and executed by the parties on March 30, 2007. (Attached hereto as Exhibit B is a true and correct copy of Estimate No. 58630). In connection with Estimate No. 58630, NetSuite sent Invoice No. 78559 to CIPC in the amount of $115,810.51. Included in Estimate No. 58630 was one NetSuite License, fifteen NetSuite user accounts and the NetCARE Gold Customer Support Package.

9.   The NetCARE Gold Customer Support Package included in Estimate No. 58630 "provides support during normal business hours, and priority queuing of calls and emails…[a]n unlimited number of cases, including weekend e-mail support, is included. NetSuite's goal is to respond to all NetCARE Gold Customer Support email cases within 1 business day." According to NetSuite's website, this package offers "unparalleled service and responsiveness" and customers choosing the package can be "assured of the fastest response time." (Attached hereto as Exhibit C is a description of the NetCARE Gold Customer Support Package from NetSuite's website, taken from http://www.netsuite.com/portal/services/support_main.shtml).

10.   CIPC sent payment for Invoice No. 78559 via wire transfer. Invoice No. 78559 charged CIPC the Canadian Goods and Services Tax (GST). To charge GST, a corporation must be Canadian corporation with a Revenue Canada Business Number. To process the wire transfer, CIPC asked for its Revenue Canada Business Number but NetSuite never provided one. Without this number, the wire transfer could not be processed.

11.     The discussions between CIPC and Mr. Getner also produced an April 19, 2007 Statement of Work for CIPC Worldwide Holdings, Netsuite Implementation – Phase I, which set forth the products and services initially purchased by CIPC from NetSuite and was incorporated by reference into the Agreement. (Attached hereto as Exhibit D is a true and correct copy of said April 19, 2007 Statement of Work).

12.     On April 26, 2007, NetSuite provided CIPC with usernames and passwords to access the 15 user accounts provided for in Estimate No. 58630. The CIPC user accounts with NetSuite were accessible through NetSuite's website. CIPC did not actively start using the NetSuite platform at this point.

13.     An additional Statement of Work was agreed to by the parties on May 24, 2007. (Attached hereto as Exhibit E is a true and correct copy of said May 24, 2007 Statement of Work). On May 31, 2007, NetSuite sent Estimate No. 62644 to CIPC, in connection with the May 24, 2007 Statement of Work. (Attached hereto as Exhibit F is a true and correct copy of Estimate No. 62644). Estimate No. 62644 billed CIPC in the amount of $21,200.00 for Implementation Service of CIPC's Jiffy Wireless brand.

14.     On June 15, 2007, CIPC contacted NetSuite about a business campaign with a popular Internet search company, which would be designed around the NetSuite platform. To fulfill its duties under this campaign, CIPC needed to provision another 300 user accounts and would need access to these accounts in 3 weeks. NetSuite assured CIPC that this could be done.

15.     On June 19, 2007, NetSuite provided a price quote for the additional 300 user accounts in Estimate No. 64289. (Attached hereto as Exhibit G is a true and correct copy of Estimate No. 64289). In addition to the 300 user accounts, CIPC was invoiced for the NetCARE Gold Customer Support Package at a cost of $73,507.50.

16.     On June 27, 2007, CIPC executed the agreement to add the 300 user licenses with the NetCARE Gold Customer Support Package. (Exhibit G hereto).

17.     On June 28, 2007, CIPC provided a receipt to NetSuite which, for the second time, confirmed that CIPC had paid $115,810.51 for Estimate No. 58630 (which included the NetCARE Gold Customer Support Package) by wire transfer.

4
COUNTERCLAIM OF DEFENDANT CIPC WORLDWIDE HOLDINGS CORP.; DEMAND FOR JURY TRIAL; CASE NO. 3:07-cv-05235-JL

18. On Friday, July 6, 2007, three days before CIPC was to commence its training on the 300 NetSuite user accounts, Josh Truesdale of CIPC attempted to create the 300 user accounts on the NetSuite website, but received an error message that CIPC had exceeded its number of user accounts. At 4:12 PM PST, Mr. Truesdale contacted NetSuite Gold Support to report that the 300 user accounts were not provisioned. Mr. Truesdale also spoke with Sam Glass in NetSuite's billing department.

19. On Friday, July 6, 2007, after Mr. Truesdale spoke with a NetSuite support representative, a support case was opened with case number 591697. After seeing no activity on the support case for the next twenty minutes and during normal business hours, Mr. Truesdale called NetSuite's billing department after being advised by the NetSuite support representative that they were the only ones at NetSuite who could provision accounts. NetSuite's billing department's voice mail box was full and Mr. Truesdale was unable to reach a live agent. Other CIPC employees also tried to contact NetSuite Gold Support via e-mail but received no response.

20. On July 7, 2007, CIPC was forced to cancel its training for the NetSuite user accounts and in order to meet its obligation to the popular Internet search company, contacted a partner to implement an emergency switch from the NetSuite platform.

21. Due to NetSuite's failure to provide "Gold" customer support services as specified in Estimates No. 58630 and 64289, as well as the damage to its campaign with the popular Internet search company caused by further delay with the 300 user accounts, on July 8, 2007, CIPC decided to switch from NetSuite to SalesForce.com.

22. On Monday, July 9, 2007, during normal business hours, CIPC again contacted NetSuite to advise it that the non-provision of the 300 user accounts still existed. On Tuesday, July 10, 2007, NetSuite sales representative Errol Getner explained to CIPC that NetSuite did not respond to CIPC's problem because all representatives from NetSuite that could help were in Cuba celebrating the company's Initial Public Offering. This contact with Mr. Getner on July 10 occurred at 4:28 PM PST. Mr. Getner also advised CIPC that everyone at NetSuite was out of the office and he had no way of assisting CIPC.

23. Having still received no response from NetSuite, at or around 5:00 PM PST on July 10, CIPC faxed its official termination letter to NetSuite. On July 11, 2007, Michele Gariepy, Director for Customer Service at NetSuite finally updated the CIPC support case in their system and apologized for the delay. However, the problem with the 300 user accounts was not fixed at this time.

24. Throughout the negotiation process before execution of the Agreement, NetSuite told CIPC that it was a critical enterprise level account at NetSuite and would be supported at the highest levels at NetSuite. To this end, NetSuite recommended that CIPC purchase its Gold NetCARE Customer Support Package which would entitle CIPC to support during normal business hours, priority queuing of calls and e-mails, an unlimited number of support cases, weekend e-mail support, and a response within one business day.

25. To date, CIPC has spent over 8,000 logged man hours configuring and setting up the NetSuite application.

26. NetSuite's failure to perform under the Agreement caused damages to CIPC in an amount to be proven at trial but estimated to be at least $5,000,000.00. This figure includes, but is not limited to, hourly costs for development staff in implementing the program, costs associated with customization, installation and configuration of the substitute SalesForce.com application, search appliances purchased from the search engine with whom CIPC was conducting its campaign (purchased for integration with NetSuite) and loss of business for 5 days.

## FIRST CAUSE OF ACTION

### (Fraud & Rescission)

27. Plaintiff hereby incorporates by reference paragraphs 1 through 26 of the Counterclaim as if fully set forth herein.

28. As reflected in Estimates Nos. 58630 and 64289, CIPC entered into agreements to purchase NetSuite's NetCARE Gold Customer Support Package at the costs of $6,547.20 and $73,507.50, respectively. In both estimates, NetSuite represented to CIPC that the NetCARE Gold Customer Support Package entitled CIPC to customer support during normal business

1 hours, priority queuing of calls and e-mails, weekend e-mail support and a response within one business day. These representations were in fact false.

29. NetSuite knew that it was unable to provide the level of customer support that was included in the NetCARE Gold Customer Support Package.

30. NetSuite made these representations with the intention to deceive and defraud CIPC and to induce CIPC to act in reliance on these representations. CIPC entered into agreements to pay the additional sums for the NetCARE Gold Customer Support Package in connection with Estimates Nos. 58630 and 64289 and to forego hiring other service providers to support its campaign with a popular Internet search company.

31. CIPC, at the time these representations were made by NetSuite and at the time CIPC took the actions herein alleged, was ignorant of the falsity of NetSuite's representations and believed them to be true. In reliance on these representations, CIPC was induced to and did agree to purchase the NetCARE Gold Customer Support Package. If CIPC had known the actual facts, it would not have taken such action. CIPC's reliance on NetSuite's representations was justified because customer service is a substantial component of NetSuite's business and NetSuite represented in paragraph 5.9 ("NetSuite's Support") of the Agreement that it had "extensive experience helping Customers improve utilization and realization of benefits of the Service…".

32. As a proximate result of the fraudulent conduct of NetSuite as herein alleged, CIPC was induced to enter into agreements to pay the additional sums for the NetCARE Gold Customer Support Package for Estimates Nos. 58630 and 64289 and to forego hiring other service providers to support its campaign with a popular Internet search company and has therefore been damaged in an amount to be proven at trial.

33. As a direct and proximate result of NetSuite's conduct, CIPC has incurred and will continue to incur reasonable attorney's fees and costs, which it is entitled to recover pursuant to the Agreement signed by representatives of CIPC and NetSuite.

WHEREFORE, CIPC prays for relief as set forth below.

7
COUNTERCLAIM OF DEFENDANT CIPC WORLDWIDE HOLDINGS CORP.; DEMAND FOR JURY TRIAL;
CASE NO. 3:07-cv-05235-JL

## SECOND CAUSE OF ACTION

### (Promise Made Without Intent to Perform & Rescission)

34. CIPC hereby incorporates by reference paragraphs 1 through 33 of the Counterclaim as if fully set forth herein.

35. Throughout the negotiation process between CIPC and NetSuite, NetSuite told CIPC that it was a critical, enterprise level account at NetSuite, and would be supported at the highest levels at NetSuite. To this end, NetSuite recommended that CIPC purchase the NetCARE Gold Customer Support Package which would entitle CIPC to support during normal business hours, priority queuing of calls and e-mails, and an unlimited number of support cases, to include weekend e-mail support and a response within one business day.

36. These promises were made by NetSuite with the intent to induce CIPC to purchase the NetSuite platform and the NetCARE Gold Customer Support Package.

37. CIPC, at the time these promises were made and at the time CIPC took the actions herein alleged, was ignorant of NetSuite's secret intention not to perform. CIPC could not, in the exercise of reasonable diligence, have discovered NetSuite's secret intention. In reliance on the promises of NetSuite, CIPC agreed to purchase NetSuite licenses (to include implementation costs and training) and the NetCARE Gold Customer Support Package to the exclusion of other vendors of the same products and services. If CIPC had known of the actual intention of NetSuite, CIPC would not have taken such action.

38. NetSuite failed to fulfill their promises, as reflected by its total failure to respond to the problem regarding the provisioning of CIPC's 300 user accounts from July 6, 2007 through July 10, 2007.

39. CIPC seeks rescission of the Agreement and return of all sums paid to NetSuite because CIPC has no other adequate remedy at law. The service of this Answer and Counterclaim shall serve as notice required under California Civil Code section 1691.

40. As a direct and proximate result of NetSuite's conduct, CIPC has been damaged in an amount to be proven at trial but estimated to be at least $5,000,000.00.

1  41. As a further direct and proximate result of NetSuite's conduct, CIPC has incurred and will continue to incur reasonable attorney's fees and costs, which it is entitled to recover pursuant to the Agreement.

WHEREFORE, CIPC prays for relief as set forth below.

### THIRD CAUSE OF ACTION

### (Negligent Misrepresentation & Rescission)

42. CIPC hereby incorporates by reference paragraphs 1 through 41 of the Counterclaim as if fully set forth herein.

43. When NetSuite made the representations that CIPC would be supported at the highest levels at NetSuite, they had no reasonable ground for believing them to be true.

44. NetSuite made these representations with the intention of inducing CIPC to act in reliance on these representations in the manner hereafter alleged, or with the expectation that CIPC would so act.

45. CIPC, at the time these representations were made by NetSuite and at the time CIPC took the actions herein alleged, was ignorant of the falsity of NetSuite's representations and believed them to be true. In reliance on these representations, CIPC was induced to and did execute the Agreement for the NetCARE Gold Customer Support Package. If CIPC had known the actual facts, it would not have taken such action. CIPC's reliance on NetSuite's representations was justified because NetSuite advertises that customer service is a substantial component of NetSuite's business.

46. As a proximate result of the fraudulent conduct of NetSuite as herein alleged, CIPC was induced to execute the Agreement for the NetCARE Gold Customer Support Package.

47. CIPC seeks rescission of the Agreement and return of all sums paid to NetSuite because CIPC has no other adequate remedy at law. The service of this Answer and Counterclaim shall serve as notice required under California Civil Code section 1691.

48. Furthermore, as a direct and proximate result of NetSuite's conduct, CIPC has been damaged in an amount to be proven at trial but estimated to be at least $5,000,000.00.

49. As a further direct and proximate result of NetSuite's conduct, CIPC has incurred and will continue to incur reasonable attorney's fees and costs, which it is entitled to recover pursuant to the Agreement.

WHEREFORE, CIPC prays for relief as set forth below.

### FOURTH CAUSE OF ACTION

### (Mistake & Rescission)

50. CIPC hereby incorporates by reference paragraphs 1 through 49 of the Counterclaim as if fully set forth herein.

51. The agreement by CIPC to purchase the additional 300 user accounts was not real, mutual or free in that it was obtained solely through mistake as herein alleged. CIPC is informed and believes and thereon alleges that the July 25, 2007 start date listed on Estimate No. 64289 for the additional 300 users was a mistake because CIPC had made clear that the project with a popular Internet search company would start July 15, 2007 and end December 15, 2007 and needed time to set up and train before July 15.

52. The mistake of fact has a material effect upon the agreed-upon exchange of performance that is adverse to CIPC in that it agreed to purchase the additional 300 user accounts under the belief that the accounts would be provisioned by July 6, 2007. CIPC will be deprived of the benefit of its bargain because it will be forced to pay for user accounts that were not timely provisioned by NetSuite.

53. CIPC does not bear the risk of that mistake because NetSuite's ability to provision these 300 user accounts was in the sole control of NetSuite.

54. The effect of the above-described mistake is such that enforcement of the agreement by CIPC to purchase the 300 user accounts would be unconscionable, in that CIPC will be deprived of the benefit of its bargain.

55. CIPC seeks rescission of the Agreement and return of all sums paid to NetSuite under same because CIPC has no adequate remedy at law. Paragraph 6.3 of the Agreement specifically provides that if the Agreement is terminated by the breach of NetSuite, NetSuite shall refund the pro rata portion of any fee that may have been paid by CIPC for services not

provided by NetSuite. The service of this Answer and Counterclaim shall serve as the notice required by California Civil Code section 1691.

56. Furthermore, as a direct and proximate result of NetSuite's conduct, CIPC has been damaged in an amount to be proven at trial but estimated to be at least $5,000,000.00.

57. As a further direct and proximate result of NetSuite's conduct, CIPC has incurred and will continue to incur reasonable attorney's fees and costs, which it is entitled to recover pursuant to the Agreement.

WHEREFORE, CIPC prays for relief as set forth below.

## FIFTH CAUSE OF ACTION
### (Breach of Contract)

58. CIPC hereby incorporates by reference paragraphs 1 through 33 of the Counterclaim as if fully set forth herein.

59. The Agreement was executed on March 31, 2007 by CIPC and by NetSuite on April 23, 2007. Under the terms of the Agreement, Estimate No. 58630, which was executed by the parties on March 30, 2007, was incorporated by reference into the agreement, set forth the products and customer support services initially purchased by CIPC.

60. Estimate No. 58630 provided for the purchase of NetSuite's NetCARE Gold Customer Support Package, which entitled CIPC to support during normal business hours, priority queuing of calls and e-mails, and an unlimited number of support cases, to include weekend e-mail support and response within one business day.

61. CIPC has performed all of the conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Agreement.

62. On June 19, 2007, NetSuite provided a price quote to CIPC for the additional 300 user accounts in Estimate No. 64289. (Exhibit G hereto). In addition to these accounts, CIPC was invoiced for the NetCARE Gold Package for the 300 user accounts at a cost of $73,507.50. CIPC executed Estimate No. 64289 on June 27, 2007.

63. From Friday, July 6, 2007 through Tuesday, July 10, 2007, NetSuite deliberately and substantially breached its obligations under Estimate No. 64289 by failing to provide

customer support in accordance with the NetCARE Gold Customer Support Package. Specifically, NetSuite's failure to provide assistance when CIPC could not access the 300 user accounts, caused by its representatives being in Cuba to celebrate NetSuite's Initial Public Offering, constituted a willful breach of the agreement. Notably, CIPC obtained this information from Mr. Getner of NetSuite on Monday, July 10, 2007 at 4:28 PM PST, which is within normal business hours, as was all contact on Friday, July 6, 2007. NetSuite further breached its obligations under the NetCARE Gold Customer Support Package by failing to provide weekend e-mail support.

64.  As a result of NetSuite's breach, CIPC has been damaged in an amount to be proven at trial but estimated to be at least $5,000,000.00.

65.  As a direct and proximate result of NetSuite's conduct, CIPC has incurred and will continue to incur reasonable attorney's fees and costs, which it is entitled to recover pursuant to the Agreement.

## SIXTH CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing)

66.  CIPC hereby incorporates by reference paragraphs 1 through 33 and 58 through 65 as if fully set forth herein.

67.  Every contract contains an implied covenant of good faith and fair dealing. NetSuite was in control of the customer support that it could provide to CIPC under the NetCARE Gold Support Package. By willfully breaching its promises to provide this level of customer support, have breached the covenant of good faith and fair dealing.

68.  As a result of NetSuite's breach, CIPC has been damaged in an amount to be proven at trial but estimated to be at least $5,000,000.00.

69.  As a direct and proximate result of NetSuite's conduct, CIPC has incurred and will continue to incur reasonable attorney's fees and costs, which it is entitled to recover pursuant to the Agreement.

///

///

WHEREFORE, CIPC prays for relief as set forth below.

## PRAYER ON THE COUNTERCLAIM

WHEREFORE, defendant and counterclaimant CIPC prays for judgment and relief as follows:

1. For general damages in an amount to be proved at trial;
2. For compensatory damages in an amount to be proved at trial;
3. For consequential damages in an amount to be proved at trial;
4. Reasonable attorney's fees and costs of suit pursuant to contract;
5. For Rescission of the Agreement and restitution of benefits conferred to counterdefendant;
6. For such other and further relief as the court may deem proper.

## **DEMAND FOR JURY TRIAL**

To the extent permitted by law, Defendant, CIPC Worldwide Holdings Corporation, respectfully demands a trial by jury in the above-entitled cause.

DATED: October 17, 2007                                McMANIS FAULKNER & MORGAN

/S/ Sharon Kirsch
WILLIAM FAULKNER
SHARON KIRSCH
GEOFFREY BENTZEL

Attorneys for Defendant and
Counterclaimant CIPC Worldwide Holdings
Corporation